THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MUTUAL INDUSTRIES, INC. | : | |
| | : | |
| v. | : | CIVIL ACTION |
| | : | |
| AMERICAN INTERNATIONAL | : | NO. 11-5007 |
| INDUSTRIES | : | |

**SURRICK, J.**                                                           **MAY  24 , 2017**

<u>**MEMORANDUM**</u>

Presently before the Court is Defendant American International Industries' Motion for

Summary Judgment.  (ECF No. 30.)  For the following reasons, Defendant's Motion will be

denied.

**I.      BACKGROUND**

Plaintiff Mutual Industries, Inc. is a Pennsylvania corporation that sells beauty supplies.

(Am. Compl. ¶¶ 1, 3-6, ECF No. 10.)  Defendant American International Industries is the

"leading manufacturer and distributor of beauty supply products and skin care products."  (*Id.* ¶

11.)  This is a diversity action in which Plaintiff alleges that Defendant sought to eliminate

Plaintiff from the beauty supply market by tortiously interfering with five distribution contracts

that Plaintiff had with three different representative groups.  (*Id.* ¶¶ 2, 11, 12.)

**A.      Procedural History**

Plaintiff commenced this lawsuit in the Court of Common Pleas in Philadelphia,

Pennsylvania.  (Compl., Notice of Removal, Ex. A, ECF No. 1.)  Defendant removed the action

to this Court pursuant to 28 U.S.C. § 1332 and 28 U.S.C. § 1441.  (Notice of Removal ¶ 14.)

Defendant filed a motion for a more definite statement.  (ECF No. 3.)  A Memorandum (ECF

No. 8) and accompanying Order (ECF No. 9) were issued, granting in part and denying in part

Defendant's motion. Plaintiff subsequently filed an Amended Complaint in compliance with this Order. Defendant filed an Answer to the Amended Complaint. (ECF No. 12.)

At the conclusion of discovery, Defendant filed the instant Motion for Summary Judgment. (Def.'s Mot., ECF No. 30.) Plaintiff filed a Response (Pl.'s Resp., ECF No. 33), and Defendant filed a reply. (Def.'s Reply, ECF No. 33.) This Motion is now ripe for disposition.

## A. Factual Background

### 1. Mastex Industries

Plaintiff claims that the dispute between it and Defendant stems from an underlying disagreement about Plaintiff's use of the trade name Mastex on some of its products. (*Id.*) In October 2008, Plaintiff purchased Mastex Health, a division of Mastex Industries, Inc., a company that manufactures professional beauty supplies and at-home healthcare products. (*Id.*)[1] Defendant subsequently purchased Thermal Spa Products,[2] a separate division of Mastex Industries, without knowledge that Plaintiff had previously purchased a different division of Mastex. (Pl.'s Resp. 4; Ryzman Dep. 52-54, Pl.'s Resp. Ex. 9.)[3]

In 2010, both Plaintiff and Defendant attended the CosmoProf trade show in Las Vegas, Nevada.[4] (Pl.'s Resp. 2.) At the show, Plaintiff's booth appeared under the name "Mutual

---

[1] In the Amended Complaint, Plaintiff alleges that it purchased "Mastex Industries." (Am. Compl. ¶ 3.) Plaintiff's Response to Defendant's Motion states that it purchased Mastex Health. (Pl.'s Resp.) This is consistent with the information provided in Martin Lipkowitz's affidavit (Lipkowitz Aff. ¶ 5, Pl.'s Resp. Ex. 7) and his deposition testimony (Lipkowitz Dep. 71, Pl.'s Resp. Ex. 8).

[2] Thermal Spa sold paraffin wax and other related products. (Pl.'s Resp. 2.)

[3] Neither party provides a date for when Defendant purchased Thermal Spa.

[4] CosmoProf is the largest annual beauty trade show in the world. Manufacturers and manufacturing representative groups attend the show to see, sell, and showcase their products. (Pl.'s Resp. 2; Lipkowitz Dep. 46.)

Industries Mastex Health" and several of their products were also labeled with this name. (Lipkowitz Dep. 96-97.)  According to Plaintiff, at some time around 10:30 a.m. on July 18 (Pl.'s Resp. 6; Lipkowitz Dep. 63, 92), Zvi Ryzman, Defendant's owner, along with its Vice-President Terry Cooper, and Vice-President of Sales, Mark Moesta, approached Plaintiff's booth.  (Pl.'s Resp. 4; Lipkowitz Dep. 120; Ryzman Dep. 32.)  At the time, Martin Lipkowitz, the National Sales Manager of Plaintiff's beauty division was representing Plaintiff at the booth.  (Lipkowitz Dep. 111.)  At Plaintiff's booth, there was a confrontation because Plaintiff was displaying a paraffin wax warmer that Ryzman thought Defendant "owned the mold to" and because Plaintiff was using the trade name Mastex that Ryzman also thought Defendant owned.  (Ryzman Dep. 44-46, 54; Lipkowitz Dep. 115-116.)

Cooper entered Plaintiff's booth, and began picking up and examining Plaintiff's display products. (Lipkowitz Dep. 112-13.)  Cooper accused Plaintiff of being "unprofessional" and claimed that Plaintiff had no right to display the products under the Mastex name.  (*Id.* at 115.) Cooper took the paraffin wax warmer off a shelf in the back of Plaintiff's booth and said the warmer belonged to Defendant.  (Lipkowitz Dep. 115.)  Cooper then pulled Plaintiff's label off of the wax warmer, which revealed some writing.  (*Id.*)  Lipkowitz claims that after Cooper pulled Plaintiff's label off the wax warmer, he saw that there was something else printed there, but was unsure what it read.  (*Id*. at 117-18.)  Lipkowitz took the warmer back from Cooper and put it under the table in Plaintiff's booth.  (*Id*. at 119.)  During this time, Moesta was taking pictures of the items Plaintiff had on display.  (*Id.* at 119-20.)

Ryzman was also involved in the confrontation.  According to Lipkowitz, Ryzman "started to scream" at him, so that everyone in the surrounding booths could hear.  (*Id*. at 122.) Ryzman said, "Your boss is a crook and a thief and a cheat and a liar, and he has no right

showing these products.  He has no right using the name Mastex."  (Lipkowitz Dep. 122.)

Ryzman also told Lipkowitz "he should be ashamed of himself" and called him "dishonest" and

a disgrace to the industry.  (*Id.*)  Ryzman claims the confrontation was not "comfortable," but he

did not admit that he was yelling.  (Ryzman Dep. 48-49.)  Ryzman also did not remember if

onlookers watched the incident, but said that it was unlikely because the confrontation happened

early in the morning.  (*Id*. at 49.)  Finally, Lipkowitz asked Ryzman and the others to leave, to

which Ryzman responded that his lawyers would be in contact with Plaintiff.  (Lipkowitz Dep.

125.)  Ryzman testified that the entire confrontation lasted about two or three minutes.  (Ryzman

Dep. 48.)  A short time later, a representative from Defendant delivered a cease and desist letter

to Lipkowitz asking Plaintiff to cease marketing its products under the Mastex trademark.  (Pl.'s

Resp. Ex. 3, Cooper Letter Ex.; Lipkowitz Dep. 130.)

Following this confrontation, a few individuals from other companies, including Irv

Morgenstern, Ron Grazulo, and a client from Texas, approached Lipkowitz and told him that

Ryzman had been discussing the incident, and had been making disparaging comments about

Plaintiff and Lipkowitz.  (Lipkowitz Dep. 62-68, 74-86; Lipkowitz Aff. 40-41.)  Lipkowitz

claims that he was told by a "couple of people that were around [Defendant's] booth that the

owner was telling people that he doesn't want any of their rep groups to sell or represent Mutual

Industries."  (Lipkowitz Dep. 62.)

Ryzman admits that after the confrontation at Cosmoprof, he learned that Plaintiff had

purchased the right to use the name "Mastex Health."  (Ryzman Dep. 57-58.)  In fact, on

September 21, 2010, Plaintiff and Defendant entered into a settlement agreement under which

the parties agreed that Plaintiff was permitted to use the name "Mastex Health."  (Def.'s Answer,

Ex. B.)

### 2. *BTB Sales & Marketing, Inc. Contracts*

BTB Sales & Marketing, Inc. ("BTB") represents manufacturers of professional beauty products. (Edward Berger Aff. ¶ 3, Def.'s Mot. Ex. G.) BTB is comprised of two separate divisions that are separate companies: the northeast division and the southeast division. (Eric Berger Dep. 12-13, Def.'s Mot. Ex. H.) Both divisions are owned by Eric Berger, Edward Berger, and Frank Turchi. (Eric Berger Dep. 12-13; Lipkowitz Dep. 26-27.) On March 1, 2010, Plaintiff entered into a manufacturer's representative agreement with BTB Northeast and BTB Southeast whereby BTB agreed to market and sell Plaintiff's various product lines. (Pl.'s Resp. Ex. 1, BTB Northeast Contract; Pl.'s Resp. Ex. 2, BTB Southeast Contract; Lipkowitz Dep. 34.) BTB also represented some of Defendant's products at that time. (Eric Berger Dep. 22-23.)

At the 2010 Cosmoprof show, Eric Berger witnessed from a distance the "verbal standoff" between Plaintiff and Defendant. (Eric Berger Dep. 24, 28.) Eric Berger believed that the argument was about Plaintiff using the name Mastex on some of its products. (Eric Berger Dep. 24.) After discussing the argument between Plaintiff and Defendant with the other BTB owners, BTB determined that it was possible that issues between Plaintiff and Defendant would continue to arise in the future. (Eric Berger Dep. 25, 27-28, 31-32.) At Cosmoprof, Eric Berger and Frank Tucci discussed what had happened between Plaintiff and Defendant with Defendant's employees. (*Id.* at 31-32.) Then, BTB determined that it was in its best interest to stop representing Plaintiff's products. (*Id.* at 32.) BTB informed Defendant that BTB would no longer be representing Plaintiff's products. (*Id.* at 32-33.) On July 20, 2010, BTB terminated its agreement with Plaintiff for the Northeast region. (Pl.'s Resp. 7; Lipkowitz Dep. 43.) According to Edward Berger, BTB's decision to discontinue its agreement with Plaintiff was "made solely by BTB, and was not influence[d] in any way by [Defendant]." (Edward Berger

Aff. ¶ 11.)  Eric Berger explained that BTB's decision was based on BTB's "feelings of just that [Cosmoprof] show and [Plaintiff and Defendant's] argument and things like that."  (Eric Berger Dep. 34.)

On March 1, 2011, BTB renewed its one-year contract with Plaintiff for the Southeast, through Eric Berger.  (Pl.'s Resp. 9.)  One month later, on April 1, 2011, BTB terminated the renewed contract and stopped representing Plaintiff in the Southeast.  (Lipkowitz Dep. 43, 135.) BTB decided to "disengage[] completely" from representing Plaintiff after BTB heard from its customers that Plaintiff was pursuing a lawsuit against Defendant.  (Eric Berger Dep. 41-42.) Eric Berger testified that no one from BTB ever spoke to Defendant about the current lawsuit. (Eric Berger Dep. 42-43.)

### 3.  *VNC Contracts*

VNC Sales & Marketing ("VNC") represents manufacturers of professional beauty products.  (Coleman Dep. 10, Def.'s Mot. Ex. C.)  VNC is made up of five territories, which are each separate legal entities controlled by either Charlie Coleman or Kevin Van Nest.  (*Id.* at 10, 37.)  Coleman owns a majority share in and operates VNC Northeast and VNC Midwest.  (*Id.* at 37-38; Van Nest Dep. 10-11, Def.'s Mot. Ex. E.)  Van Nest owns a majority share in and operates VNC Southwest, VNC Westcoast, and VNC Southeast.  (Van Nest Dep. 10-11.)  VNC represents Defendant's product lines in the northeast, midwest, and southwest.  (Coleman Dep. 12-13.)  VNC represented many of these lines in 2010.  (*Id.*)

On October 1, 2010, Plaintiff and VNC Northeast entered into a contract whereby VNC agreed to represent Plaintiff's products in the northeast.  (Pl.'s Resp. Ex. 5.)  On November 1, 2010, VNC Westcoast also entered into a contract with Plaintiff, agreeing to represent Plaintiff's products throughout the west coast.  (Pl.'s Resp. 8; Pl.'s Resp. Ex. 4.)  On March 19-20, 2011,

Plaintiff appeared at the Northeast Beauty Representatives Association ("NeBRA") Eastern Buying Conference Trade Show under the VNC banner because VNC Northeast was representing Plaintiff at the time. (Lipkowitz Aff. ¶¶ 53-54.)

On April 1, 2011, Plaintiff received a letter from Coleman and Van Nest of VNC. (Pl.'s Resp. Ex. 6.) The letter informed Plaintiff that VNC was terminating its relationships with Plaintiff "as to all lines and for all purposes effective April 1, 2011." (Pl.'s Resp. Ex. 6.) The letter did not cite a reason for the termination. (*Id.*) According to Coleman, the termination letter was sent because Plaintiff's product line "was just not generating enough," and VNC's representatives needed to concentrate on the larger lines. (Coleman Dep. 27-28.) Coleman decided that VNC would stop representing Plaintiff's products in the northeast region. (Coleman Dep. 31, 33.) Coleman said his decision was not discussed with Defendant. (Coleman Dep. 32-33.) John Madia, the territory manager for VNC Westcoast (Coleman Dep. 10-11), decided to stop representing Plaintiff's products on the west coast.[5] (Van Nest Dep. 16.) According to Madia, VNC's decision to terminate its agreement with Plaintiff "was made solely by VNC, in the best interests of the company, and was not controlled by [Defendant]." (Def.'s Ex F, Madia Aff. ¶ 8.) Lipkowitz testified that David Harrison, John Madia, and two female representatives each told him that VNC had to resign Plaintiff's product line because Coleman had received a call from Defendant "saying that we would suggest that you no longer represent Mutual Industries." (Lipkowitz Dep. 157-59, Lipkowitz Aff. ¶ 60.)

---

[5] Coleman said VNC's decision to stop representing Plaintiff's products on the Westcoast was made by Van Nest. (Coleman Dep. 32-22.) This conflicts with Van Nest's testimony that he had nothing to do with terminating VNC Westcoast's agreement with Plaintiff. (Van Nest Dep. 21.)

4. *CFN Contract*

CFN Beauty Representation or CFN Sales and Marketing ("CFN") represents manufacturers of professional beauty products. (Cohen Aff. ¶ 3, Def.'s Mot. Ex. J; Cohen Dep. 8, Def.'s Mot. Ex. K.) CFN is a partnership owned by Charles Cohen, Steven Nutile, and Gary Fishkin. (Cohen Dep. 8.) CFN represents some of Defendant's brands in the northeast. (Cohen Dep. 11.) On July 16, 2010, at Cosmoprof, Cohen visited Plaintiff's booth, and according to Lipkowitz, expressed interest in representing Plaintiff's products in the Midwest region. (Pl.'s Resp. 4; Lipkowitz Aff. ¶¶ 26-27; Lipkowitz Dep. 168-69.) Cohen allegedly told Lipkowitz "I would like to have [Plaintiff's product line] for the Midwest," and agreed to send Lipkowitz a contract. (Lipkowitz Dep. 169.) Cohen says that no such interest was ever expressed. (Cohen Dep. 17.) A few days later, Cohen informed Plaintiff via telephone that CFN would not represent Plaintiff's product line. (Pl.'s Resp. 7; Lipkowitz Aff. ¶ 49; Cohen Dep. 19.) Lipkowitz claims Cohen said "we would love to represent you in the midwest, but a lot of us reps are under pressure from [Defendant] not to be involved with you." (Lipkowitz Dep. 170.) Cohen again denied making any such statements, and said CFN declined to represent Plaintiff's product line because Cohen was not interested in doing business with Lipkowitz. (Cohen Dep. 19-20.) Cohen states that CFN's decision to not enter into a business relationship with Plaintiff was "made solely by CFN, and was not influenced in any way by [Defendant]." (Cohen Aff. ¶ 9.) Further, Cohen says that CFN was never contacted by Defendant with regard to Plaintiff's interest in having CFN represent its products. (*Id.* at ¶ 8; Cohen Dep. 20-21.)

5. *Plaintiff's Other Contracts with Manufacturing Representatives*

Plaintiff also has contracts with other companies that represent manufacturers of professional beauty products. (*See* Lipkowitz Aff. ¶ 67.) Specifically, Plaintiff has a contract

with Lewis and Associates for representation on the west coast, and with Jay Stone for representation in the southwest. (*Id.* ¶ 67.) Both Lewis and Associates and Jay Stone still represent Plaintiff's product lines. (*Id.* ¶ 69.) Neither company represents any of Defendant's product lines. (*Id.* ¶ 68.)

## II. LEGAL STANDARD

### A. Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(a) summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party has the initial burden of showing that no genuine issue of material fact exists. *Adderly v. Ferrier*, 419 F. App'x 135, 136 (3d Cir. 2011) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). If the movant carries his burden, the nonmoving party must "set forth specific facts demonstrating a genuine issue for trial." *Id*; *see also Celotex*, 477 U.S. 317 at 324 ("[T]he nonmoving party [must] [] go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."); *Fireman's Ins. Co. of Newark, N. J. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982) (nonmovant cannot "rely merely upon bare assertions, conclusory allegations or suspicions").

In determining if a factual dispute is genuine, the Court must consider whether "the [record] evidence [taken as a whole] is such that a reasonable jury could return a verdict for the nonmoving party . . . . The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be [significantly probative] evidence on which the jury could reasonably find for the plaintiff." *Bialko v. Quaker Oats Co.*, 434 F. App'x 139, 141, n.4 (3d Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248, 252 (1986)). "A

disputed fact is material if it would affect the outcome of the suit as determined by the substantive law." *J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.*, 650 F.3d 915, 925 (3d Cir. 2011) (quoting *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992)).  The Court must view facts and inferences in the light most favorable to the nonmoving party.  *Id.*  We are not permitted to resolve factual disputes or make credibility determinations.  *Seigel Transfer, Inc. v. Carrier Exp., Inc.*, 54 F.3d 1125, 1127 (3d Cir. 1995).

### B.     Applicable Law

Initially, we address what law applies to Plaintiff's claims.  In federal diversity cases, a federal court applies the conflict-of-law rules of the forum state in which it sits.  *See Garcia v. Plaza Oldsmobile LTD.*, 421 F.3d 216, 219 (3d Cir. 2005).  Under Pennsylvania choice-of-law rules, "the first question to be answered in addressing a potential conflict-of-laws dispute is whether the parties explicitly or implicitly have chosen the relevant law."  *Assicurazioni Generali, S.P.A. v. Clover*, 195 F.3d 161, 164 (3d Cir. 1999).  Courts should apply the state law that the parties have agreed upon.  *Id.*; *Atl. Pier Assocs., LLC v. Boardakan Rest. Partners*, 647 F. Supp. 2d 474, 486 (E.D. Pa. 2009) ("Generally, if the parties have agreed to the applicable law, that agreed upon law should be given effect.").  Here, the parties agree that Pennsylvania law governs Plaintiff's tortious interference claims.  (*See* Def.'s Mot. 21; Pl.'s Resp. 12.) Accordingly, we will apply Pennsylvania law to Plaintiff's claims.

## III.   DISCUSSION

Pennsylvania recognizes both interference with existing contractual relations and interference with prospective contractual relations as branches of the tort of interference with a contract.  *See U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.*, 898 F.2d 914, 925 (3d Cir. 1990).  "While the two branches of tortious interference are distinct, they share essentially the

same elements." *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc*., 140 F.3d 494, 529 (3d Cir. 1998).  A claim for intentional interference with contractual or prospective contractual relations requires proof of:

> (1) the existence of a contractual or prospective contractual or economic relationship between the plaintiff and a third party;
>
> (2) purposeful action by the defendant, specifically intended to harm an existing relationship or intended to prevent a prospective relation from occurring;
>
> (3) the absence of privilege or justification on the part of the defendant;
>
> (4) legal damage to the plaintiff as a result of defendant's conduct; and
>
> (5) for prospective contracts, a reasonable likelihood that the relationship would have occurred but for the defendant's interference.

*Id*.

### A.     Tortious Interference with a Contract

Here, the parties do not dispute that Plaintiff had contracts with third-parties BTB and VNC.  Under these contracts, BTB Northeast, BTB Southeast, VNC Northeast, and VNC Westcoast had agreed to sell and market Plaintiff's product lines.  Therefore, the first element of a claim for tortious interference with a contract has been satisfied.  The legal damage element of tortious interference is similarly not in dispute at this time.  Therefore, the fourth element of a tortious interference claim has been satisfied for present purposes.  (Pl.'s Resp. 12.)

The second and third elements of tortious interference, which are closely related, are not as clear in this case.  The second element—purposeful action intended to harm—requires that Plaintiff show that Defendant acted for the purpose of causing harm to Plaintiff.  *Glenn v. Point Park College*, 272 A.2d 895, 899 (Pa. 1971).  While Defendant did not have to act with the

specific intent to interfere with Plaintiff's contract, it must have acted "improperly and with the knowledge that such interference is substantially certain to occur." *Barmasters Bartending Sch., Inc. v. Authentic Bartending Sch., Inc.*, 931 F. Supp. 377, 386 (E.D. Pa. 1996) (citation omitted). Intent can often be inferred from circumstantial evidence such as a defendant's state of mind and possible motives. *Geyer v. Steinbronn*, 506 A.2d 901, 910 (Pa. Super. Ct. 1986) (explaining that because it is rare for a defendant to declare he intended to interfere with a contractual relationship, a jury is often "called upon to draw an inference from circumstantial evidence" on whether the requisite intent existed).

The third element—absence of privileges or justification—requires Plaintiff to show Defendant's actions were improper. *Empire Trucking Co., Inc. v. Reading Anthracite Coal Co.*, 71 A.3d 923, 934 (Pa. Super. Ct. 2013). In determining whether or not an actor's conduct was "proper," the Court is guided by the following factors:

> (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference and (g) the relations between the parties.

*Nathanson v. Med. Coll. of Pa.*, 926 F.2d 1368, 1388-89 (3d Cir. 1991).

Although what is not proper conduct in a given situation is not capable of being precisely defined, the central inquiry is whether the defendant's conduct is "sanctioned by the 'rules of the game' which society has adopted." *Glenn*, 272 A.2d at 899. In applying these factors, the issue in each case is "whether the interference is improper or not under the circumstances; whether, upon a consideration of the relative significance of the factors involved, the conduct should be permitted without liability, despite its effect of harm to another." *Phillips v. Selig*, 959 A.2d 420, 430 (Pa. Super. Ct. 2008) (citation omitted). Normal competitive activities do not constitute

tortious interference with a contract.  *See Gilbert v. Otterson*, 550 A.2d 550, 554 (Pa. Super. Ct. 1988).

### 1.    Interference with BTB Northeast Contract

It appears from Plaintiff's Amended Complaint and Plaintiff's Response that Plaintiff is alleging that Defendant interfered with the contract Plaintiff had with BTB Northeast by accusing Plaintiff of unethical business practices at Cosmoprof and by directing BTB to stop doing business with Plaintiff.  (Am. Compl. ¶¶ 10-15; Pl.'s Resp. 13-14.)  Defendant moves for summary judgment claiming that Plaintiff has not produced "a single piece of evidence" to support its claim.  (Def.'s Mot. 29.)  Plaintiff claims that it has supplied enough evidence to survive this Motion.  (Pl.'s Resp. 13-14.)  A review of the record reveals that Plaintiff has established that material facts are in dispute with regard to whether Defendant intentionally and improperly interfered with the BTB Northeast contract.

Plaintiff's version of the events at Cosmoprof would support the inference that Defendant acted purposefully to harm Plaintiff.  Lipkowitz testified that on July 18, 2010, Defendant's owners and employees came to Plaintiff's Cosmoprof booth and "screamed" accusations and insults at Lipkowitz for several minutes, allowing all of the manufacturing representative groups in the surrounding area to hear.  (Lipkowitz Dep. 122.)  Ryzman specifically accused Plaintiff of having no right to use the Mastex name.  In fact, Plaintiff did have the right to use the Mastex name and some of the accusations made by Ryzman were later determined to be untrue.  At Cosmoprof, BTB's Eric Berger witnessed this confrontation.  Defendant's employees then spoke to the owners of BTB about the confrontation, at which time BTB decided it was in BTB's best interest to stop representing Plaintiff in the northeast.  BTB informed Defendant of its decision.  BTB's Eric Berger also admitted that BTB Northeast stopped representing Plaintiff because of

the confrontation between Plaintiff and Defendant at Cosmoprof, although he said that Defendant did not explicitly pressure BTB into terminating its contract with Plaintiff. Defendant disputes these facts to the extent that Ryzman did not admit he was "screaming," but called the confrontation uncomfortable. Ryzman also said he did not remember if manufacturing representative groups were around during the confrontation, but he thought that it was unlikely because the confrontation occurred early in the morning. These factual disputes affect whether a jury can infer that Defendant intended to harm Plaintiff.

Viewing these disputed facts in the light most favorable to Plaintiff, a reasonable factfinder could conclude that at Cosmoprof, Defendant's owner and employees acted with the intent to harm Plaintiff by publicly and conspicuously confronting and insulting Plaintiff when Plaintiff was surrounded by manufacturing representative groups. A jury may further find that Defendant's employees acted with the knowledge that a public confrontation with Plaintiff at Cosmoprof was substantially likely to interfere with contracts that Plaintiff had with manufacturing representative groups that were present. Thus, if Plaintiff's version of the events at Cosmoprof is believed to be true by a jury, the second element of tortious interference with a contract will have been established. *See Rossi v. Schlarbaum*, 600 F. Supp. 2d 650, 660 (E.D. Pa. 2009) (denying summary judgment on tortious interference claim when the plaintiff's version of the facts supported intent to interfere).

Plaintiff's version of the events at Cosmoprof could also support a finding that Defendant's conduct was improper. Defendant's owner went to Plaintiff's booth because he thought Plaintiff was misrepresenting Defendant's wax warmer and trade name, a motive that could be considered proper. *Empire Trucking Co.*, 71 A.3d at 935 ("[A]ct[ing] to protect a legitimate business interest alone does not privilege [a competitor's] actions."). However, the

way in which Defendant's owner and employees insulted and accused Plaintiff of wrongdoing, which caused BTB Northeast to terminate its contract with Plaintiff two days later, cannot be so easily labeled as proper. *Phillips*, 959 A.2d at 433 (stating that "in some circumstances misrepresentations and/or rumor mongering by a competitor may constitute improper interference with contractual relations"). There is a dispute over how Ryzman confronted Plaintiff and which of the representatives were present during the confrontation. These two facts impact a determination of whether Defendant's conduct was proper because the nature of Defendant's conduct and Defendant's motive are factors that should be considered in evaluating "proper" conduct. If Plaintiff proves that Ryzman was in fact yelling at Plaintiff's booth when manufacturing representative groups were around, a reasonable factfinder could find Defendant's conduct improper. Overall, a jury must resolve factual disputes surrounding what happened at Cosmoprof before a determination can be made with regard to whether Defendant's actions fall outside the societal "rules of the game" or were simply normal competitive behavior.

Plaintiff has established that factual questions remain with regards to what happened at Cosmoprof that are material to determining whether Defendant intentionally and improperly interfered with Plaintiff's contract with BTB Northeast. Consequently, issues for trial remain, and summary judgment is not appropriate on Count I, as it relates to the BTB Northeast contract.

          2.     *Interference with BTB Southeast and VNC Contract*

Plaintiff claims that Defendant tortiously interfered with the contracts that Plaintiff had with BTB Southeast and VNC. Plaintiff alleges that Defendant directed BTB Southeast and VNC to terminate their respective contracts with Plaintiff. Plaintiff contends that Defendant's interference can be inferred from circumstantial evidence that primarily relates to the timing and

context of the termination.[6]  Most notably, both BTB Southeast and VNC terminated their respective contracts with Plaintiff on the exact same day, without any prior notice.  "We are [] mindful that the evidence relied upon by the non-moving party need not be direct evidence, but may be circumstantial evidence and the inferences reasonably deducible therefrom."  *InfoSAGE, Inc. v. Mellon Ventures, L.P.*, 896 A.2d 616, 626 (Pa. Super. Ct. 2006); *see also Geyer*, 506 A.2d at 910 ("[T]he jury usually will be called upon to draw an inference from circumstantial evidence.").  Courts are permitted to infer factual conclusions based on circumstantial evidence when "human experience indicates a probability that certain consequences can and do follow from the basic circumstantial facts."  *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 116 (3d Cir. 1980).

### i.    BTB Southeast

BTB Southeast renewed its contract with Plaintiff on March 1, 2011.  The contract was renewed for one year, and termination of the contract was permitted with ninety days written notice.  However, on April 1, 2011, only one month after renewing its contract, BTB Southeast cancelled its contract with Plaintiff.  BTB Southeast did not provide any prior notice to Plaintiff, either written or oral, before terminating the contract.  BTB Southeast decided to "disengage[] completely" from representing Plaintiff after BTB heard from its customers that Plaintiff was pursuing a lawsuit against Defendant.  (Eric Berger Dep. 41-42.)  By cancelling its Southeast

---

[6] Plaintiff also offers direct evidence that Defendant tortiously interfered with Plaintiff's contracts.  Plaintiff alleges that agents from both BTB Southeast and VNC told Lipkowitz that Defendant had pressured them into terminating their respective contracts with Plaintiff. (Lipkowitz Dep. 63, 138-167.)  Defendant argues that Lipkowitz's statements are inadmissible hearsay, and offers deposition testimony from Coleman and Berger, who deny many of the Lipkowitz assertions.  Since we conclude that Plaintiff has offered sufficient circumstantial evidence to demonstrate that there is a dispute of material fact as to whether Defendant improperly intervened in Plaintiff's contractual relationships, we need not address the hearsay issue at this time.  That issue will be addressed based upon the circumstances at trial.

contract without any notice one month after signing its renewal lease, BTB did not honor its one-year contract with Plaintiff, nor did it provide the required ninety-day notice.

ii.     <u>VNC</u>

VNC signed a contract with its Northeast region on October 1, 2010, and signed a contract with its Westcoast region on November 1, 2010. VNC was required to provide thirty days written notice in order to terminate its contracts with Plaintiff. Like BTB Southeast, VNC terminated all of the contracts that it had with Plaintiff on April 1, 2011. VNC did not provide any prior notice, either written or oral, before terminating its contracts with Plaintiff. Rather, VNC simply sent a fax to Plaintiff stating it was terminating its relationships with Plaintiff "as to all lines and for all purposes effective April 1, 2011." (Pls. Resp. Ex. 6.) VNC's fax did not cite any reason for its termination.

In addition, VNC cancelled its contract with Plaintiff only ten days after Plaintiff displayed its products under the Mastex brand at the 2011 NeBRA Eastern Buying Conference Trade Show. Specifically, Plaintiff was displaying its Mastex products under the VNC banner. Lipkowitz stated while at the NeBRA trade show, he spoke with one of VNC's representatives, Charlie Coleman. According to Lipkowitz, Coleman said "we look for a great relationship between [VNC] and [Plaintiff]."[7] (Lipkowitz Dep. 140.) Lipkowitz stated that Coleman said he

---

[7] Defendant argues that these statements should be rejected as inadmissible hearsay. We agree that "hearsay statements can be considered on a motion for summary judgment only if they are capable of admission at trial." *Shelton v. Univ. of Med. & Dentistry of New Jersey*, 223 F.3d 220, 226 n.7 (3d Cir. 2000). However, we disagree with Defendant that these statements are not necessarily capable of admission at trial.

The statements may be admissible "depending on the purpose for which they [a]re used." *New L&N Sales & Mktg., Inc. v. Menaged*, No. 97-4966, 1998 WL 575270, at *5 (E.D. Pa. Sept. 9, 1998); *see also E.E.O.C. v. Standard Register Co.*, 805 F. Supp. 2d 77, 81 n.5 (M.D. Pa. 2011) (holding that the court is permitted to consider the deposition testimony because the non-moving party "might offer th[e] statement into evidence for some purpose other than to prove the truth of the matter asserted" (citation omitted)). Here, Coleman's statements might be used to demonstrate his intent, motive, or plan. *See United States v. Hernandez*, 176 F.3d 719, 726 (3d

was "very, very happy with [Plaintiff's] line." (*Id*. at 142.) It is notable that VNC was representing Plaintiff's Mastex products at the NeBRA trade show ten days before VNC suddenly terminated the contract. Since Defendant created an improper disturbance at Cosmoprof in 2010 because Plaintiff was selling its products under the Mastex brand, and since Plaintiff similarly marketed its products under the Mastex brand at NeBRA in 2011, it would be reasonable for a jury to infer that Defendant may have acted improperly in order to keep its consumer base. Plaintiff has produced evidence showing that only ten days before it suddenly terminated its relationship with Plaintiff, VNC was satisfied with Plaintiff. Given that VNC also had a contractual relationship with Defendant at the time, a reasonable jury could conclude that Defendant influenced VNC to terminate its contract with Plaintiff after observing VNC promote Plaintiff's Mastex products.

This fact, coupled with the fact that BTB Southeast terminated its contract with Plaintiff on the *exact same day*, raises a dispute of material fact as to whether Defendant tortiously interfered in Plaintiff's contractual relationships with BTB Southeast and VNC. Lipkowitz testified that "[t]he only sales Reps that have ever dropped [Plaintiff] did so either at the CosmoProf . . . or ten days after the 2011 NeBRA show . . . ." (Lipkowitz Affidavit 7.) At both of those trade shows, Plaintiff was displaying its Mastex products. Plaintiff maintains that the only time that a sales representative has terminated a contract with Plaintiff is if the sales representative also had an ongoing contractual relationship with Defendant.

Cir. 1999) ("The rule is now firmly established that there are times when a state of mind, if relevant, may be proved by contemporaneous declarations of feeling or intent." (citation and internal quotation marks omitted)).

Given that these statements may be capable of admission at trial, we will consider them at this stage. We note, however, that this consideration does not make the statements automatically admissible at trial. *See Fraternal Order of Police, Lodge 1 v. City of Camden*, 842 F.3d 231, 239 (3d Cir. 2016) ("We do not, of course, intend this ruling to control whether these out-of-court statements will actually be admitted at trial. That question need not be answered now.").

In this case, human experience would permit a reasonable jury to find that Defendant improperly interfered with Plaintiff's contractual relationships with BTB Southeast and VNC. Accordingly, issues for trial remain, and summary judgment is not appropriate as it relates to Plaintiff's contracts with BTB Southeast and VNC.

**B.     Tortious Interference with a Prospective Contract**

To establish a "prospective contractual relationship," Pennsylvania law requires that there be an "objectively reasonable probability" that a contract would have come into existence. *Schulman v. J.P. Morgan Inv. Mgmt., Inc.*, 35 F.3d 799, 808 (3d Cir. 1994) (citing *Thompson Coal Co.* v. *Pike Coal Co.*, 412 A.2d 466, 471 n.7 (Pa. 1979)).  The probability must be "something less than a contractual right but more than a mere hope that there will be a future contract."  *Acumed LLC v. Advanced Surgical Serv., Inc.*, 561 F.3d 199, 213 (3d Cir. 2009) (citation omitted).   "This is an objective standard which of course must be supplied by adequate proof."  *Polay v. West Co.*, No. 88-9877, 1990 WL 59351, at *10 (E.D. Pa. May 7, 1990) (citations omitted).

Plaintiff alleges that Defendant tortiously interfered with the prospective contract that Plaintiff had with CFN.  As evidence that there was a prospective contract, Plaintiff refers to Lipkowitz's interactions with CFN employee, Chuck Cohen.  Lipkowitz testified that at Cosmoprof, he called Cohen over to his booth and told Cohen about Plaintiffs' products, and his desire to do business with CFN.  Lipkowitz stated that Cohen brought four sales representatives over to Lipkowitz's booth.  Cohen subsequently left Lipkowitz's booth and then returned twenty minutes later.  According to Lipkowitz, Cohen stated that he "would like to have [Plaintiff's line] for the Midwest."  (Lipkowitz Dep. at 168-69.)  In response, Lipkowitz told Cohen to call him on Thursday, that they would "set up a sales meeting" during that phone call, and that he would then

"fly out to Chicago as soon as the sales meeting is available." (*Id.*) In response, Cohen then

stated "that sounds good to me" and told Lipkowitz that he would call him on Thursday.[8] (*Id.*)

Cohen specifically rejects making any of these statements. Cohen stated that he never

told Lipkowitz that he was interested in representing Plaintiff, and that he would never want to

be involved in conducting business with Lipkowitz. A review of the record reveals that Plaintiff

has established that material facts are in dispute with regard to whether there was a prospective

contract between CFN and Plaintiff. Cohen's alleged statements at Cosmoprof indicate that

there is more than a "mere hope" that there would be a contractual relationship between CFN and

Plaintiff. *Acumed*, 561 F.3d at 213 (citation omitted). Cohen's statements suggest that he

intended to sell Plaintiff's products, and that he intended to set up meetings with Lipkowitz in

order to develop this business relationship. This is sufficient to demonstrate a prospective

contractual relationship between CFN and Plaintiff.

Lipkowitz states that Cohen called him the Thursday following Cosmoprof, informing

him that he did not wish to represent Plaintiff's products. Cohen denies this. According to

Lipkowitz, Cohen reaffirmed during the phone call that he would "love to represent [Plaintiff] in

the Midwest," however he did not attempt to form a business relationship with Plaintiff.

(Lipkowitz Dep. 170.) As discussed above, if Plaintiff proves that Ryzman was in fact yelling at

Plaintiff's booth when manufacturing representative groups were in the vicinity, a reasonable

jury may find that Defendant acted with intent to harm Plaintiff's prospective contract, and may

thus find Defendant's conduct improper. Given the testimony that Cohen demonstrated an

interest in representing Plaintiff, and yet refused to do business with Plaintiff shortly after

---

[8] Defendant argues that Cohen's statements should not be considered because they are
inadmissible hearsay. Similar to the reasoning above, there is a possibility that Cohen's
statements could be used to show his then-existing state of mind to prove his intent, plan, or
motive—that he intended to form a contractual relationship with Lipkowitz in the future. Again,
the admissibility of any hearsay statements will be determined at trial.

Cosmoprof, Plaintiff has established that material facts are in dispute as to whether Defendant improperly interfered with this potential contract. Therefore, issues for trial remain, and summary judgment is not appropriate as it relates to Plaintiff's prospective contract with CFN.

## IV.    CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment will be denied. An appropriate Order follows.

**BY THE COURT:**

**R. BARCLAY SURRICK, J.**